## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO: 6:25-cv-02490

REYNEL SUAREZ, on behalf of himself
individually and others similarly situated.

     *Plaintiff,*

v.

STEEL X HOMES, LLC,
a Florida limited liability company;             CLASS REPRESENTATION
RICHARD RIVERA, a Florida individual;
CATALINA REBOLLEDO, a Florida           JURY TRIAL DEMANDED
individual; PAAVO SALMI, a Florida individual;
LAEQALI AND ASSOCIATES, INC.,
a Florida corporation; ALI SAYED,
a Florida individual;
HALLMARK HOME MORTGAGE, LLC,
a foreign limited liability company,
FAIRWAY INDEPENDENT MORTGAGE
CORPORATION, a foreign corporation,
STEEL X HOMES DEVELOPMENT LLC n/k/a
C1 BUILDERS LLC, a Florida limited liability company;
ALEJANDRO MARRIAGA; a Florida individual
and KAYE FLANAGAN,
a Florida individual,

     *Defendants.*

_____/

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Reynel Suarez, individually and on behalf of a class of similarly situated individuals, sues Defendants, Steel X Homes, LLC ("Steel X") n/k/a ICON; Richard Rivera ("Rivera"), Catalina Rebolledo ("Rebolledo"), Paavo Salmi ("Salmi") Laeqali and Associates, Inc. ("Laeqali"), Ali Sayed ("Sayed"), Hallmark Home Mortgage, LLC ("Hallmark"), Fairway Independent Mortgage Corporation

("Fairway"), Steel X Homes Development LLC n/k/a C1 Builders LLC ("Steel X Homes Development"), Alejandro Marriaga ("Marriaga"), and Kaye Flanagan ("Flanagan"), and alleges as follows:

## INTRODUCTION

1.      This action is a classic wolf in the hen house situation. Defendants Richard Rivera and Catalina Rebolledo are a married couple that defrauded roughly one hundred families that were actively seeking to become homeowners. This scam preyed on the vulnerabilities of a huge life moment and was only possible because Rebolledo abused her position as a Mortgage Loan Originator within Hallmark to repeatedly structure fraudulent mortgages to eager homebuyers that she knew her husband's company, Steel X, had no intention of constructing. This allowed Hallmark to disburse millions of dollars of the victims' mortgage money to her husband in kickbacks and fraudulent construction draws.

2.      The scam was two-fold. Rivera and Salmi ran what was essentially a construction Ponzi scheme through their company Steel X. Rivera funneled these customers to his wife, Rebolledo — a Mortgage Loan Originator at Hallmark — who would structure the mortgages with specific construction benchmarks that could be manipulated by passing around the same valuable construction materials from project to project. As new homebuyers came to Steel X, it would use the new investors mortgage money to pay actual contractors to continue building the early-buyers home to prolong the scam. But, as always happens in schemes where no actual value is being created, Rivera, Salmi, and Rebolledo closed up shop

2

overnight and nearly a hundred victims are left with unfinished houses in various stages of the construction process. And, to add insult to injury, Hallmark and Fairway, with full knowledge of all the problems created by the mortgages they originated from Steel X, have begun threatening the foreclosure process on the properties in their dilapidated states and intimidated some of the potential class into settling any and all claims in fear that they could lose even more money from this scam.

3.    Hallmark — and Fairway because it acquired Hallmark — had knowledge of this fraudulent scheme because its employee Rebolledo used her position within the bank to structure the mortgages with full knowledge that her husband's company had no intention of fully completing the projects. And independently from Rebolledo the banks had knowledge because the portfolio of Steel X mortgages all failed to deliver a completed home in the specified time period. Homeowners repeatedly complained to Hallmark and Fairway that construction was delayed or abandoned, and valuable materials were being stolen from their construction sites. Despite these repeated warnings from the banks' customers, Hallmark and Fairway instituted foreclosure proceedings against many of their customers to bring this scheme to its conclusion.

4.    Every single member of the Class relied on Hallmark's fraudulent misrepresentation and/or omission that Steel X and the affiliated companies intended to construct the home that Hallmark was acquiring a mortgage on. Hallmark had full knowledge that Steel X had no intention of completing the

Class's homes at issue and omitted that fact to induce them to take out a mortgage on the property, make sizeable down payments as part of the mortgage, and thereafter make further payments to buy materials and pay contractors to complete their homes.

## PARTIES, JURISDICTION, AND VENUE

5.    The Court has subject matter jurisdiction over the federal claim raised herein and supplemental jurisdiction over the remaining the state law claims.

6.    The Court also has subject matter jurisdiction over the FDUTPA and fraudulent misrepresentation claims because there is total diversity between the parties and the total amount in controversy exceeds $75,000 exclusive of attorneys' fees and costs.

7.    Reynel Suarez is an individual who resides in Lehigh Acres, Florida.

8.    Defendant Steel X is a Florida limited liability company engaged in the marketing and sale of steel-framed residences of prefabricated construction, with its principal place of business at 1475 Pine Avenue, Orlando, Florida, 32824.

9.    Defendant Rivera is an individual residing in Florida who is one of the primary perpetrators of the deceptive scheme employed by Defendant Steel X.

10.    Defendant Rebolledo is an individual residing in Florida who is one of the primary perpetrators of the deceptive scheme employed by her and her husband

11.    Defendant Salmi is an individual residing in Florida who is an associate of Rivera in the fraud described below.

12.    Defendant Laqaeli and Associates, Inc. is a dissolved Florida corporation. In its Voluntary Articles of Dissolution the corporation claimed it was "being extorted through multiple demands contained in exaggerated claims . . ." Likely referring to its role in the fraud described below.

13.    Defendant Ali Sayed was the managing member of Laeqali and Associates and knew about the fraud described below and made misrepresentations to prospective homeowners in an attempt to settle the claims.

14.    Defendant Hallmark is a foreign limited liability corporation who operates, conducts, engages in, and is carrying on a business or business venture in this state and has an office in Florida. Defendant Hallmark also committed tortious acts within Florida against the Plaintiff. And Hallmark breached a contract in this state by failing to perform acts required by the contract to be performed in this state.

15.    Defendant Fairway acquired Hallmark and therefore is subject to the jurisdiction of this Court to the extent Hallmark is for the acts at issue. Defendant Fairway is also subject to the jurisdiction of this Court for operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state. Fairway maintains nearly 50 offices in the state of Florida.

16.    Defendant Steel X Homes Development is a Florida limited liability company that was used by Rivera and Salmi to carry out the Steel X Fraud

described below. In 2024, to escape the stench of the Steel X name, the company changed its name to C1 Builders LLC.

17.     Defendant Marriaga is an individual residing in Florida.

18.     Defendant Flanagan is an individual residing in Florida who was a Senior Vice President of Hallmark during the times in question and had knowledge of the fraud described below.

19.     All Defendants are subject to the jurisdiction of this Court as they have committed tortious acts within the state as described by Florida Statute § 48.193(1)(a)2.

20.     The Court also has personal jurisdiction over Hallmark and Fairway pursuant to Fla. Stat. § 49.193(1)(a)1 because they operate, conduct, engage in, and carry on a business venture in and around Florida; and pursuant to Fla. Stat. § 49.193(1)(a)3 because they hold a mortgage on the real property at issue within this state.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claim occurred in this district.

## THE STEEL X FRAUD

22.     Defendant Steel X is a company owned and operated by Defendants Rivera and Salmi that advertised the ability to construct new residential homes in under a year.

23.    The business was marketed on sites like Zillow, Redfin, and other online real estate platforms offering new construction homes for interested home buyers.

24.    Steel X never maintained a construction license but marketed itself to prospective homeowners as a company that could build and deliver turn-key homes around Florida in under a year.

25.    Rivera and his business partner Salmi promised they could provide prospective homeowners with a seamless start to finish homebuilding experience in four major steps: (1) locate land that they could purchase to construct the home on; (2) find a bank to finance the land purchase and Steel X's construction of the home; (3) obtain the construction permits needed; and (4) construct the home model promised and deliver the finished home to the prospective purchaser.

26.    After receiving a response from the prospective homebuyer, Rivera and Salmi introduced them to Hallmark as their "preferred lender."

27.    Rivera's wife, Rebolledo, was a mortgage loan originator for Hallmark. This was a significant aspect of Steel X's representations that it could provide a complete "package" from site selection to finished structure. Rivera led the victims to Rebolledo under the guise that Hallmark was the businesses "preferred lender" and offered the victims a 6% discount on the total price of construction if they used Hallmark.

28.     To offset this discount from Steel X, Hallmark secretly inflated the loan contracts with the victims by 6%, which Hallmark ultimately paid to Steel X as a commission.

29.     Rivera and Salmi hid the fact that Rebolledo and Rivera were married. Rebolledo concealed her marital relationship with Rivera to give the scheme a sense of legitimacy by having a seemingly independent bank, Hallmark, vouch for Steel X.

30.     Salmi was represented as Steel X's architect, without being an architect.

31.     Steel X was not in fact the builder of prefabricated model homes in other parts of the state, contrary to the representations of Defendants Rivera and Salmi.

32.     The representations of the Defendants were deliberately misleading and deceptive. Steel X was not a builder of homes and only employed the building plans used by other builders of the same model homes.

33.     Steel X was not even a contractor but withheld this fact from proposed customers such as Plaintiff.

34.     Hallmark, Fairway, Steel X, Laeqali, Rivera, Silva, Sayed, Marriaga, Flanagan, and Rebolledo conspired together to create a working relationship where Steel X would hold out Hallmark as its preferred lender, and Hallmark would return the favor by vouching for Steel X as a legitimate homebuilder.

35.    Of course, this relationship generated profit for Hallmark through loan fees, interest, and kickbacks.

36.    It was hidden from the homebuyer that Hallmark was providing a "kickback" to Steel X for each customer it brought to Hallmark that signed up for a home mortgage. This kickback violated the Real Estate Settlement Procedures Act, 12 U.S.C. 2601 et seq. and is mortgage fraud under Fla. Stat. § 817.545.

37.    On top of this undisclosed kickback, Steel X and Hallmark used their own attorney, Alejandro Marriaga, who owned and operated Marriaga Law Group, P.A. d/b/a Lawyers Title Network.

38.    Marriaga was also in on the Steel X Fraud with Rivera and Robelledo.

39.    While clearly having a conflict, Marriaga claimed to serve as the "neutral settlement agent" between the buyers, Steel X, and Hallmark.

40.    Marriaga would send monetary amounts that differed from the signed loan documents straight to Steel X to do with as it pleased.

41.    The money often never went to the construction projects and many of the third-party contractors that Steel X allegedly contracted with to build these homes — because it had no construction license — never received any of the loan proceeds.

42.    Marriaga was disbarred by the Florida Supreme Court on September 18, 2025, for his role in the Steel X Fraud.[1]

---

[1] *The Florida Bar v. Alejandro L. Marriaga*, No. SC2024-1241, dated September 18, 2025.

43.    The Florida Supreme Court reviewed just three complaints against Marriaga, all of which were victims of the fraud described in this complaint. The referee in the action found that:

- "Marriaga transferred the funds without the buyers' authorization to Steel X;"

- Marriaga "did so with the intent to conceal those connections from the buyers and to reroute their escrow funds in violation of the closing disclosures, for his own benefit and to the detriment of his clients, without notice or consent;" and

- "Although Marriaga claimed to not represent Steel X in the real estate transaction and portrayed himself as a 'neutral settlement agent,' he was far from an uninterested party."

44.    After the loan closing, and disbursements of the initial draw and the kickback to Steel X, there was varying levels of work done on the home projects. Earlier victims' homes received a house frame with some internal furnishings, and then for later victims, the land was purchased but no construction ever began.

45.    No matter the stage of the construction, a recurring problem arose for many of the prospective homeowners that was in furtherance of the fraud.

46.    The prospective homeowners either noticed through their own diligence or were notified by Steel X or Hallmark that their homes had been vandalized and/or construction materials were removed from the property.

47.    Silvo, Rivera, and Flanagan (a higher up at Hallmark) told the various homeowners that they should report the matter to their respective insurance carrier for reimbursement.

48.     One concrete example of this happened to the Buccolo family. When they reported to Hallmark that steel had been stolen from their lot, Flanagan told the Buccolos that they should report the stolen steel to their insurance carrier for reimbursement. But the steel was not stolen, as the Buccolos subsequently discovered.

49.     Flanagan directed contractors to take the steel from the Buccolo's project and be used for another project financed by Hallmark, not related to the construction of the Buccolo's home, but utilizing the same design plans and thus employing the same steel structures.

50.     Flanagan and Hallmark's instruction to the Buccolos that they should report the steel to their insurance company as stolen, with full knowledge that the steel had not been stolen but re-appropriated for their own financial gain, was a false statement that caused the Buccolo's to submit an insurance claim.

51.     Upon information and belief, many of the other homes that suffered vandalism and theft under Steel X's supervision were acts carried out by Steel X, Hallmark, and those working in concert with them to increase the profitability of the enterprise.

52.     Following the same pattern as the Buccolo's home, Steel X, Hallmark, Silvo, Rivera, and Flanagan, would cause valuable items to be taken and moved to another project under the guise of random criminal acts and to then have the victimized homeowner submit the matter to its insurance company.

53.     This insurance scam increase the projects profitability in at least two different ways: (1) by moving items to a new project, Steel X would meet a benchmark which would allow it to receive more of the construction draw from the mortgage company Hallmark; and (2) it could then replace the materials at no cost to Steel X by applying the insurance proceeds from the insurance claim to the original property.

54.     Rebolledo and other employees of Hallmark knew that the benchmarks needed for construction loan withdrawals were not being legitimately met but allowed Hallmark to disburse the money anyways.

55.     Finally, to add insult to injury, after years of inactivity on the construction of homes that were promised to be completed in a year or less, many of the prospective homeowners were approached by Hallmark, through Flanagan and/or Rebolledo, and told they had two choices (1) refinance the loan with Hallmark, extending the time to complete the property, paying more money to Hallmark, and waive all claims against Hallmark; or (2) have the property foreclosed upon, lose all the payments made up to that point, and potentially be personally liable for the remainder of the mortgage loan because it was unlikely that the unfinished property would result in an amount that would cover the outstanding balance.

56.     Hallmark made these threats with full knowledge of the Steel X Fraud and their role in it. Had Hallmark not had a central role in the Steel X Fraud, it wouldn't have required a blanket waiver of all claims against it.

57.    At the inception of the parties' business relationship, Defendants Steel X, Rivera, and Salmi were intent on keeping the interest of new prospective purchasers, while concealing from them the true history of Rivera's prefabricated home business.

58.    Rivera had a history of fraudulent business practices, perpetrating the same or similar scams first under the name Solar X, then changed to Steel X, under the trade name Icon.

59.    Each name change coincided with a new wave of consumer complaints for stolen deposits, unfinished homes, and lawsuits. Rivera was intent on not disclosing any part of his true business history, or the fact that his "preferred lender" Hallmark's director of new business was in actuality Rivera's wife, or that by pre-arrangement with Hallmark the mortgage discounts offered to new customers were eclipsed by illegal draws siphoned off the mortgage loan at closing and disbursed as a kick-back to Steel X, but ultimately charged to Plaintiff on the amortization schedule of the loan.

60.    Eventually, Steel X stopped responding to all the affected home owners and closed up shop overnight.

61.    Then, on or about June 11, 2025, Hallmark entered into an asset sale with Defendant Fairway Independent Mortgage Corporation.

62.    Although titled an asset sale in public postings, Hallmark continued on its business as a division of Fairway titled "Hallmark Home Mortgage, Powered by Fairway."

63.     The founder and CEO of Hallmark, Deborah Sturges, joined Fairway with the title of "President," and is still running the Hallmark business. Upon information and belief Sturges continues to exercise ownership over Hallmark via ownership and control over Fairway in the asset purchase.

64.     Upon information and belief, the asset purchase deal with Fairway left the original Hallmark company insolvent because it was unable to pay its debts, obligations, and liabilities.

65.     Hallmark continues to operate the same website with its branding and award, (https://myhhm.com) and has simply made legal changes to the website to notate it is now owned by Fairway.

**The Steel X Fraud's Enterprise.**

66.     The following individuals and companies associated-in-fact to carry of the Steel X Fraud: Steel X n/k/a ICON, Rivera, Rebolledo, Salmi, Laeqali, Hallmark, Fairway, Steel X Homes Construction, Sayed, Flanagan, and Marriaga.

67.     The enterprise that carried out the Steel X Fraud is an ongoing organization, which engaged in, and whose activities affected, interstate commerce.

68.     The purpose of the enterprise was to target and defraud prospective homebuyers into entering a mortgage with Hallmark that would then pay substantial sums to Steel X and would then ultimately be disbursed to the individual members of the enterprise. The enterprise started with Steel X, Rivera, Salmi, Laeqali, and Steel X Homes Construction marketing their ability to build

new-construction homes in under a year. Once a prospective homebuyer contacted

them about purchasing one of these homes, they would be referred to Rebolledo at

Hallmark under the guise of being their "preferred lender." Rebolledo was Rivera's

wife and at all times had full knowledge that Steel X had no intention of completing

the homes. Rather, Rebolledo, Sayed, and Flanagan would make

misrepresentations to the prospective homebuyers that (1) Steel X, Rivera, and

Salmi were legitimate builders that intended to complete this homes within one

years; and, (2) that certain milestones of the building process were met by Steel X

in order to disburse more money to Steel X, when those construction milestones

had not been met. Hallmark and Fairway then attempted to foreclose on these

mortgages knowing that they were fraudulently procured, and extorted more

money from prospective homebuyers through increased interest rates, a

mandatory waiver of all claims, and ultimately instituting foreclosure proceedings.

69.    While Defendants participated in and are members of the enterprise

which carried out the Steel X Fraud, they also have an existence separate and

distinct from the enterprise.

70.    In order to successfully trick the Plaintiff and other similar situated

class members into taking out loans with Hallmark, Defendants needed a multi-

level scheme of contractors, architects, and mortgage brokers promising them that

the Steel X Fraud was a legitimate enterprise which would build them a home.

71.    Steel X and Rivera made promises to Plaintiff and other similarly

situated class members that they would hire contractors to build a home, using

their architects at Laeqali to design the home. These false promises created a referral system to Hallmark, where Rivera's wife Rebolledo worked as a loan origination officer. Rebolledo and Hallmark would vouch for the legitimacy for Steel X to induce Plaintiff and other class members to put down sizeable down payments on these homes and take out a mortgage worth hundreds of thousands of dollars.

72.    The Steel X Enterprise started in or about 2019, and continued to operate through at least 2024. Upon information and belief, certain members of the enterprise continue to take actions in furtherance of the enterprise to cover up their fraud to date.

**Defendants each committed at least two predicate acts of racketeering.**

73.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have engaged in conduct violating each of these laws to effectuate their scheme.

74.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal

16

Service or commercial interstate carriers, including but not limited to contracts for the mortgage, contracts for the construction of the home, correspondences about fake update for the project, mortgage letters requesting payment, and other communications in furtherance of the Steel X Fraud.

75.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things which include but are not limited to updates regarding construction, demand for payments, misrepresentations about intentions to complete the project, and other correspondences.

76.     The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e. indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years. In fact, each of the Defendants has committed or aided and abetted in the commission of hundreds of acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiff and class members.

77.     The multiple acts of racketeering activity which Defendants committed and/or conspired to or aided and abetted in the commission of, were

related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. 1961(5).

78.    The multiple concealments of personal relationships of the parties, conflicts of interest, misrepresentations of material facts by the Defendants as set forth above, and breaches of contract have directly and proximately caused financial harm to Plaintiff.

**The injury to property.**

79.    The Plaintiff and all of the other victims suffered an injury to their real property as a result of the Steel X Fraud.

80.    They all purchased the land that the Steel X Fraud promised their home would be built on.

81.    The Plaintiff and all of the other victims suffered damages between the value of the home they were promised by Defendants and the value of the property they actually received.

**The Steel X Fraud was built on the same misrepresentation: their intention to build a completed home for the Plaintiff and other victims to induce the victims into taking out a mortgage with Hallmark.**

82.    The Plaintiff and all of the other victims of the Steel X Fraud relied on the promises of Steel X, Rivera, Salvi, Rebolledo, Hallmark, and Flanagan that they intended to build these homes to completion in under a year, which induced the

18

victims to take out mortgages on their property from Steel X's "preferred lender,"

Hallmark.

## CLASS REPRESENTATION ALLEGATIONS

83. Plaintiff brings this action pursuant to Federal Rules of Civil

Procedure 23(b)(1)(B) and 23(b)(3), individually and on behalf of the Class of

similarly situated individuals. The "Class" is defined as:

> All (i) persons or entities in the United States, including all States,
> territories, protectorates, and federal districts (ii) who obtained a loan from
> Hallmark in connection with a construction contract with Steel X or any
> affiliated entities owned or operated by Rivera and/or Salmi (iii) during the
> Relevant Time Period.

(the "Class.")

84. Plaintiff reserves the right to seek to amend the Class definition if

discovery or further investigation reveals that the Class should be expanded or

otherwise modified.

85. In addition to the regular class, there will be a sub-class defined as the

"Waiver Sub-class."

86. The Waiver Sub-class is defined as:

> All (i) persons or entities in the Class (ii) who entered into a Construction
> Phase Extension Agreement which released all claims against Hallmark.

87. Plaintiff reserves the right to establish additional sub-classes as

appropriate.

88. **Class Exclusions:** The following individuals or entities are excluded

from the Class: (1) any Judge or Magistrate Judge presiding over this action and

members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) the legal representatives, successors, or assigns of any such excluded persons; and (5) Plaintiff's counsel, Defendants' counsel, and their respective immediate family members.

89.    **Numerosity:** Although Plaintiff does not know the exact size of the Class because said information is in the exclusive control of Defendants, it is evident that the Class is so numerous that joinder of all members into one action is impracticable. Based upon the nature and scope of the conduct involved herein and the information available from public records, the approximate number of Class members exceeds one hundred individuals and/or entities, and most of them are likely to be geographically dispersed throughout Florida, with the possibilities some others geographically dispersed elsewhere in the United States.

90.    **Typicality:** Plaintiff's claims are typical of the claims of other members of the Class in that proving Plaintiff's claims will simultaneously prove the claims of all Class members. Plaintiff and each Class member are victims of the Schemes alleged herein. Plaintiff and all members of the Class were damaged by the same conduct of Defendants as complained of herein.

91.    **Commonality**: Plaintiff's and Class members' claims raise common factual and legal questions that can be answered for all Class members in a single

Class-wide proceeding. Questions of law and fact arising out of Defendants'
conduct are common to all members of the Class. For example, to adjudicate the
claims, it would be necessary to resolve the following issues, each of which can be
answered through common, generalized evidence, though the following list is not
exhaustive:

    a. whether the conduct of Defendants constituted a civil RICO conspiracy
       which violated Federal and Florida statutes;

    b. whether the conduct of Defendants outlined above as part of the Steel X
       Fraud constitutes an Enterprise;

    c. whether each of the Defendants committed at least 2 predicate acts in
       furtherance of the Steel X Fraud.

    d. whether Hallmark had actual knowledge of the Steel X Fraud;

    e. whether Plaintiff and the Class relied on the misrepresentations and
       omissions of Hallmark in furtherance of the Steel X Fraud; and

    f. whether Fairway is liable for the actions of Hallmark at issue in this case
       due to the acquisition or other equitable legal principle.

92. **Adequacy:** Plaintiff will fairly and adequately protect the interests of
the Class and has no interests that are antagonistic to the interests of Class
members. It is in Plaintiff's best interest to prosecute the claims to obtain full
redress due to them. Plaintiff's interests do not conflict with the interests of the
Class because one or more questions of law and/or fact regarding liability are
common to all Class members, and, by prevailing on its own claims, Plaintiff

necessarily will establish Defendants' liability to other Class members. Plaintiff has retained counsel experienced in class action litigation and complex civil litigation to prosecute this action on behalf of the Class.

93.  **Superiority:** A class action is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted herein because common questions of law and fact predominate over any individual questions that may arise, and significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigating the common issues on a Class-wide basis instead of a repetitive, individual basis. Many Class members' individual damage claims are too small to make individual litigation an economically viable alternative, Defendants may not have the economic means to cover the damages for each and every member of the Class, and since this fraud has been uncovered only a few Class members have instituted a separate action. This action is an inherently complex RICO conspiracy claim that trumps the modest size of many individual Class members' claims. However, the aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a Class action on a cost-effective basis, especially when compared with repetitive individual litigation. Given the size of individual Class members' claims, few Class members could afford to seek legal redress individually for the wrongs Defendants committed against them. Despite this large scale fraud against roughly one hundred prospective homeowners, very few have sought legal redress to date. When the liability of Defendants is adjudicated, claims

of all members of the Class can be determined by the Court. This action will facilitate the orderly and expeditious administration of the Class's claims, economies of time, effort, and expense will be fostered, and uniformity of outcome will be ensured. Without a class action, the Class members will continue to suffer damages and Defendants' violations of law will proceed without remedy while Defendants continue to reap and retain the proceeds of its wrongful conduct. No unusual difficulties are likely to be encountered in the management of this class action. The forum is desirable because the acts or omissions giving rise to the claims the Steel X fraud that was based in this district, and much of the real property at issue sits within this district.

94.    **Ascertainability:** Members of the Class can be identified and ascertained objectively through Defendants' records. Specifically, Plaintiff will be able to ascertain who obtained a loan from Hallmark during the Relevant Time Period through Hallmark's records, along with relevant contact information.

## COUNT I
## <u>FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES</u>
## [Fla. Stat. § 772.103(3)]
## (Against All Defendants)

95.    Plaintiff reavers and re-alleges paragraph 1 through 94, as if fully set forth herein.

96.    All of the Defendants conspired to carry out and took actions in furtherance of the "Steel X Fraud." Summed up, the purpose of the Steel X Fraud was to lock prospective homeowners into a mortgage with Hallmark based on the

representation that Steel X could deliver a new construction home on a piece of land located by Steel X. Behind the scenes, all Defendants knew that Steel X had no intention of completing the homes, but rather, made false representations to extract money from the prospective homeowners through sizeable downpayments and recurring monthly mortgage payments. When the unsuspecting homeowners became concerned that their home's construction was far behind, the Defendants intimidated them through threats that if they did not continue to pay or re-finance the home at an increased interest rate, they would foreclose on the property, stripping them of all the equity they had built to that point and any chance of moving into the home they had their hearts set on.

97.    In furtherance of the scheme, Defendants violated several Florida and Federal laws, including:

- Mortgage fraud [Fla. Stat. § 817.545]

- False and fraudulent insurance claims [Fla. Stat. § 817.234]

- Theft [Fla. Stat. § 812.014]

- Criminal mischief against real property [Fla. Stat. § 806.13]

- Wire Fraud [Fla. Stat. § 817.034]

98.    Each of the Defendants had a distinct and important role in the Steel X Fraud.

99.    Rivera and Salmi — through their company Steel X and Steel X Homes Development — made false representations to the Class regarding its intent to construct a completed home for the Class. The purpose of these representations

were to induce the Class to take out a loan with its "preferred lender" Hallmark. Hallmark had full knowledge of the Steel X Fraud and in furtherance of the fraud it vouched for the legitimacy of Steel X and its intention to construct finished homes for the class in less than a year

100. Hallmark, Rebolledo, and its Vice President Flanagan knowingly assisted in the Steel X Fraud and also committed mortgage fraud, false and fraudulent insurance claims, and theft in violation of their respective Florida statutes to further the Steel X Fraud.

101. Based upon Steel X's marketing and relying upon the incomplete and deceptive misrepresentations of Rivera, Salmi, Robelledo, and Hallmark, Plaintiff signed the Residential Construction Loan Agreement—with Defendant Hallmark. Upon information and belief the entire Class entered into a similar if not identical agreement during the Steel X Fraud.

102. Plaintiff and members of the Class each made a downpayment to Hallmark due to be victims of the Steel X Fraud. They also made various amounts in monthly payments on the loan, had out of pocket expenses in their good faith attempts to further the construction of their homes, and have had to pay expenses to live elsewhere for multiple years when their homes were not finished in time.

103. Significantly, the Residential Construction Agreement designated Defendant Hallmark as the "preferred lender" and offered a Builder credit of "up to 6% of the purchase price of the construction cost towards [Plaintiff's] closing costs and prepaids," and that "Buyer will not be required to make loan related

interest payments during the construction phase" all of which were substantial inducements to enter into the contract, and upon which Plaintiff relied to their detriment.

104. Permitting Defendant Steel X, which was not the builder, to be disbursed a redundancy fee was without the knowledge or authorization of Plaintiff and merely created an illegal slush fund for Steel X, increasing the amount due from Plaintiff on the mortgage, and directly and proximately causing the Plaintiff financial injury.

105. Steel X's agents, and Hallmark's agents, including Defendant Flannagan, made continuous misrepresentations to Plaintiff about the progress of the work. Steel X requested additional drawings from the Loan, in contravention of the Loan's Draw Schedule and the Residential Construction Agreement.

106. When the Plaintiff confronted Hallmark with this information, Ms. Flanagan sought to placate them with her assurances that the house would be built, that the lot was being cleared, and the steel was being ordered. Each of these statements was knowingly false and made by Ms. Flanagan with the intent to deceive the Plaintiff. Ms. Flanagan personally committed to be "the point of contact for the project," and undertook responsibility to find a replacement contractor for Laeqali.

WHEREFORE, Plaintiff, on behalf of himself and the Class, demands judgment in their favor against Defendants Steel X, Hallmark, Fairway, Steel X Homes Development, Laeqali, Rivera, Rebolledo, Salmi, Syed, Marriaga, and

Flanagan, for treble damages of the damages sustained due to the predicate acts of Defendants, jointly and severally, together with interest, attorneys' fees, and costs incurred in connection with this action, and for such other relief the Court may deem just and proper.

## COUNT II
## FEDERAL CONSPIRACY TO VIOLATE CIVIL RICO
### [18 U.S.C. § 1962(d)]
### (Against all Defendants)

107.    Plaintiff reavers and re-alleges paragraph 1 through 94, as if fully set forth herein.

108.    Plaintiff, the class members and Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

109.    All of the Defendants conspired to carry out and took actions in furtherance of the "Steel X Fraud." Summed up, the purpose of the Steel X Fraud was to lock prospective homeowners into a mortgage with Hallmark based on the representation that Steel X could deliver a new construction home on a piece of land located by Steel X. Behind the scenes, all Defendants knew that Steel X had no intention of completing the homes, but rather, made false representations to extract money from the prospective homeowners through sizeable downpayments and recurring monthly mortgage payments. When the unsuspecting homeowners became concerned that their home's construction was far behind, the Defendants intimidated them through threats that if they did not continue to pay or re-finance the home at an increased interest rate, they would foreclose on the property,

stripping them of all the equity they had built to that point and any chance of moving their families into the home they had their hearts set on.

110.   In furtherance of the scheme, Defendants violated several Federal laws, including:

- Bank Fraud [18 U.S.C. § 1344]

- Mail Fraud [18 U.S.C. § 1341]

- Theft [Fla. Stat. § 812.014]

- Criminal mischief against real property [Fla. Stat. § 806.13]

- Wire Fraud [Fla. Stat. § 817.034]

111.   Each of the Defendants had a distinct and important role in the Steel X Fraud.

112.   Hallmark, Rebolledo, and its Vice President Flanagan knowingly assisted in the Steel X Fraud and also committed mortgage fraud, false and fraudulent insurance claims, and theft in violation of their respective Florida statutes to further the Steel X Fraud.

113.   Based upon Steel X's marketing and relying upon the incomplete and deceptive misrepresentations of Rivera, Salmi, Robelledo, and Hallmark, Plaintiff signed the Residential Construction Loan Agreement—with Defendant Hallmark. Upon information and belief the entire Class entered into a similar if not identical agreement during the Steel X Fraud.

114.   Plaintiff and members of the Class each made a downpayment to Hallmark due to be victims of the Steel X Fraud. They also made various amounts

in monthly payments on the loan, had out of pocket expenses in their good faith attempts to further the construction of their homes, and have had to pay expenses to live elsewhere for multiple years when their homes were not finished in time.

115.    Significantly, the Residential Construction Agreement designated Defendant Hallmark as the "preferred lender" and offered a Builder credit of "up to 6% of the purchase price of the construction cost towards [Plaintiff's] closing costs and prepaids," and that "Buyer will not be required to make loan related interest payments during the construction phase" all of which were substantial inducements to enter into the contract, and upon which Plaintiff relied to his detriment.

116.    Permitting Defendant Steel X, which was not the builder, to be disbursed a redundancy fee was without the knowledge or authorization of Plaintiff and merely created an illegal slush fund for Steel X, increasing the amount due from Plaintiff on the mortgage, and directly and proximately causing the Plaintiff's financial injury.

117.    Steel X's agents, and Hallmark's agents, including Defendants Flannagan, Rivera, Salmi, Sayed, and Rebolledo, made continuous misrepresentations to Plaintiff about the progress of the work.

118.    Steel X would request Hallmark to make additional drawings from the Loan, in contravention of the Loan's Draw Schedule and the Residential Construction Agreement.

119.    Steel X and Hallmark would represent to Plaintiff and the Class that certain benchmarks had been met, when they had not. Steel X, Hallmark, and their representatives knew that these benchmarks had not been met but represented they had anyways in order to funnel more money to Steel X.

120.    When the Plaintiff confronted Hallmark with this information, Flanagan, Rivera, Salmi, and/or Rebolledo sought to placate them with her assurances that the house would be built, that the lot was being cleared, and the steel was being ordered. Each of these statements was knowingly false and made by Flanagan with the intent to deceive the Plaintiff. Flanagan personally committed to be "the point of contact for the project," and undertook responsibility to find a replacement contractor for Laeqali.

121.    WHEREFORE, Plaintiff, on behalf of himself and the Class, demands judgment in their favor against Defendants Steel X, Hallmark, Fairway, Steel X Homes Development, Laeqali, Rivera, Rebolledo, Salmi, Syed, Marriaga, and Flanagan, for treble damages of the damages sustained due to the predicate acts of Defendants, jointly and severally, together with interest, attorneys' fees, and costs incurred in connection with this action, and for such other relief the Court may deem just and proper.

## COUNT III
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Against Defendants Hallmark and Fairway)

122.    Plaintiff reavers and re-alleges paragraph 1 through 94, as if fully set forth herein.

123.    Defendants Halmark, Fairway, and Steel X, made numerous false representations to Plaintiff and others throughout Florida as to the quality, durability and viability of a Steel X prefabricated home as well as initial and ongoing misrepresentations as to financing and construction.

124.    Florida enacted the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competitions, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202.

125.    It declared unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.204(1).

126.    Defendants Hallmark and Fairway engaged in the following enumerated unfair and deceptive acts, each of which were deceptive and unfair practices as defined by Fla. Stat. §501.203(7), in that they:

a.    Solicited buyers, including Plaintiff, to buy Steel X model homes that they never intended to build;

b.    Sent the realtors and buyers, including Plaintiff, to the same model homes to demonstrate viability when they knew or should have known the model homes were not representative of their true delivery capacity;

c.    Marketed Steel X model homes as superior to anything else available on the market when they knew or should have known that to be false;

d.      Failed to disclose the marital relationship between Defendant Rivera and Catalina Rebolledo when promoting Hallmark as their "preferred lender;"

e.      Represented to Plaintiff that Steel X would make the "interest only" payments on the Loan while the home at the Property was in construction;

f.      Collected Plaintiff's deposit for the construction of the home and did not apply the deposit towards same;

g.      Gave Plaintiff false timelines regarding the completion of the home at the Property when they knew or should have known they would not complete the building in that time; and

h.      Plaintiff was presented with Hallmark's closing package containing improper draw amounts for Steel X. This feature of the closing documents was not unique to Plaintiff's subject transaction, but was representative of a series of transactions in which Hallmark, through the efforts of Flannagan, was the lender for a Steel X home, and in which Flannagan, Hallmark, Rivera and Steel X conspired together  to allow Steel X to improperly and illegally draw money from the closing transaction, and to which money Steel X was not entitled either by law or contract.

127.    These deceptive and unfair practices caused actual damage to Plaintiff by

a.  luring them to purchase a Steel X prefabricated home,

b.  costing them their Initial Deposit,

c. luring them into the Loan, which was inflated by illegal draws, and which is now at risk of foreclosure; and

d. causing Plaintiff to incur housing expenses while the home at the Property remains unfinished.

128. But for these deceptive and unfair practices, Plaintiff would not have engaged in the subject contract.

129. Each of these statements and omissions were deceptive in that Plaintiff and the consuming public acting reasonably under the same circumstances are likely to have been deceived.

130. As a direct and proximate result, Plaintiff has been damaged.

131. Plaintiff has retained the undersigned law firm for representation herein and are obligated to pay their counsel reasonable legal fees.

132. Plaintiff is far from the only person that have fallen victim to the deceptive acts and practices of Defendants Steel X, Rivera, Hallmark and Flannagan. Several other victims have already filed suit against these Defendants throughout Florida. Upon information and belief, the Defendants' scheme is ongoing, and Defendants continue to act with reckless disregard for the consequences of their unfair, deceptive, and/or unconscionable business practices.

133. If Defendants are allowed to continue business operations throughout Florida, countless other residents are at risk of being similarly defrauded.

**WHEREFORE**, Plaintiff demands judgment against Defendants Hallmark and Fairway, jointly and severally, for the following relief:

a.     An award for compensatory, incidental, and consequential damages;

b.     Plaintiff's reasonable attorney's fees and taxable costs;

c.     Punitive damages; and

d.     Such further and other relief this Court deems just and proper.

## COUNT IV
## FRAUDULENT INDUCEMENT (Waiver Sub-class)
### (Against Defendants Hallmark and Fairway)

134.   Plaintiff reavers and re-alleges paragraph 1 through 94, as if fully set forth herein.

135.   The Waiver Sub-class entered into an extension agreement with Hallmark with the purpose of extending the construction time for the contractors to finish the homes financed by Hallmark.

136.   In exchange for Hallmark extending the time allowed for construction under the original agreements, the Waiver Sub-class had to release all claims they had against Hallmark relating to the original loan.

137.   Rebolledo and Flanagan, agents of Hallmark, made representations to each of the Wavier Sub-class that the contractors needed only a few more months to complete the homes and that without entering into the extension agreement, Hallmark would be forced to foreclose on the loan.

138.   Rebolledo and Flanagan, as explained above, knew that the construction was never going to be completed. These extension agreements were just another tool used by the Defendants to extend their fraud.

139.    Hallmark's false representations that the contractors needed a few more months to complete the homes was false and Hallmark knew it was false at the time the statements were made.

140.    The Waiver Sub-class relied on these representations when they signed the extension agreement.

**WHEREFORE,** the Waiver Sub-class requests this Court rescind and void the extension agreements and the attached wavier of all claims.

### DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury as to all claims in this Complaint for which a jury trial is allowed by law.

Dated on the 29th day of December 2025.

**WEIL LAW FIRM, P.A.**

By: */s/ Luke T. Jacobs*
　　　Ronald P. Weil, Esq.
　　　Luke T. Jacobs, Esq.
Florida Bar Nos. 169966 & 1024787
E-Mail:  *Rweil@weillawfirm.net*
E-Mail:  *Ljacobs@weillawfirm.net*
E-Mail:  *Service@weillawfirm.net*
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Telephone: (305) 372-5352